Good morning, Michael Brown for Appellants, Retirees. May it please the court. Counsel, you don't have to stand up. The way I have it set up, Your Honor, I don't think I can do anything but stand up. All right, all right. I just wanted to make sure you weren't doing that for us. Thank you. I would disappear if I sat down. Last year, the California Supreme Court revisited the issue of the implied vesting of public employee benefits in the Cal Fire case. It repeated its holding from 3 to 2011 Supreme Court case. The best thing can be proven by manifest evidence of legislative intent. But then it went on to hold that if the employment benefit at issue constitutes deferred compensation, that benefit is vested without regard to other evidence of legislative intent. Quoting from the court, even in the absence of a manifest legislative intent to create such rights, contractual rights are implied as a result of the nature of the employment benefit. The court noted that pension benefits are the paradigm deferred compensation, but the court repeatedly made it clear that other benefits would qualify for this protection. The court said, quote, we have consistently recognized that elements of public employee compensation, other than pension benefits, also may be entitled to this type of protection, end quote. And the court specifically said it would not limit the protection to the types of benefits that have been protected historically. Now, the court didn't create sort of a flood, open floodgate for vested rights claims. It gave us some guidance on how we determine what is a vested, what is deferred compensation, what is not with a two part test. First, does it, quote, flow directly from the public employee service, end quote. And second, is the magnitude of the benefit, quote, roughly proportional to the time of that service. Here, the county does not and cannot dispute that this benefit, the grant benefit, meets both of those requirements. Employees automatically received it. They were required to contribute into the program. They had no choice. The second prong of the test, the magnitude of the benefit, is also indisputable. The grant went up the more years you worked. It was calculated by multiplying a base number. It started at $10 times years of service. That's undisputed. The retirees have other very strong evidence that the grant benefit was pension-like deferred compensation. It was funded in large part by $50 million out of a $200 million surplus in pension funds in 1992. Now, the surplus pension funds are obviously deferred compensation. In effect, what the county did was it took surplus pension funds and embodied those funds in a retirement health benefit. The remainder of the funding came from a mandatory 1% ongoing contribution from employees into the program. Now, the county says it paid for that 1% by virtue of a wage increase. But even if that's true, it doesn't change the analysis. I have a question for you before you get any further into the facts. The Cal Fire case was decided several months before the district court's decision before us today. And yet, I don't see any mention in the district court's decision about this deferred compensation argument. And why is that? Did you argue this below? Your Honor, we didn't cite Cal Fire below, but we've been making the deferred compensation argument for years now. In the last appeal, the deferred compensation issue was front and center. This court reversed the district court based on its finding that we had ample evidence that this was an element of deferred compensation. So Cal Fire is essentially adding additional authority to our argument that this benefit constituted deferred compensation. But if you look at this court's 2018 opinion, the center of the rationale for reversing was that this benefit constituted deferred compensation based on the allegations at that point. The remainder of the funding, in addition to the pension funds, came from the employee contribution. Now, the county says it covered that contribution. Even if it did, what the county is saying is that it gave employees a 1% wage increase in 1993. And it told employees they had to defer the actual enjoyment of that benefit, of that money, until they were retired. They had to pay it into the grant program. So the 1% is deferred compensation because the county paid it and said you have to defer receipt of this until you're retired. This court focused on the 1% rebate in 2018. It held that that rebate, quote, strongly reinforced retirees' position. And that the grant benefits, quote, constituted a form of deferred compensation assured to those employees who continued working until they became eligible. Nothing changed on remand. That analysis of the court is as true now as it was in 2018. We have ample evidence, in fact, mostly undisputed evidence, that every fact, alleged fact, on which this court relied in 2018 was proven on remand. So I would say there's really no question that it has a pension-like character that is deferred compensation. Certainly, we met the standard for summary judgment on this issue. We raised a triable issue of fact. Counsel? Yes. Isn't the issue before us today whether or not the district court erred in determining that there was no material issue of fact regarding whether or not the county intended to create a vested contract right in these terms? Isn't that the issue that we have to resolve today? Correct. And under the deferred compensation has been recognized as a form of vested compensation. But we're talking about in this particular case, under these particular facts, whether or not the county intended to create an implied vested contract right for the benefit in question. Correct, Your Honor. Whether deferred compensation benefits have been recognized, I understand you're trying to cast this as a matter of deferred compensation in the hopes that that will lead us to say it's a vested right. But to me, that begs a question. The question in this case is whether this particular benefit was intended to be created by the county as a vested one. Your Honor, I understand. I think they're one and the same, though. I think that all of the evidence we have of the negotiating history, the funding mechanism, the way that it was presented to the unions, 1% rebate, all of those go to what the intent of the county was. When a public employer creates a benefit with certain characteristics, CAL FIRE says that benefit we presume an intent to vest. That's what CAL FIRE says. But wasn't there language that the plan didn't create any vested rights to the benefit in the resolution adopting it? Yes, correct. I was just going to get to that, Your Honor. The 1993 plan document includes a clause that says the county, by establishing and maintaining this plan, does not give any employee, retiree, or any person any legal or equitable right against the county. It does not say that no person has a right against the county with regard to the grant benefit. It says by establishing and maintaining this plan. And this court in 2018 recognized that distinction. It said that retirees do not rely on the plan for their claim. Retirees rely on the MOUs, which is a separate document. The MOUs were negotiated. The plan document was not negotiated. And the court's rationale in 2018 was if it wasn't negotiated, then it doesn't defeat our claim as a matter of law. If the county intended that clause to defeat MOU rights, it would be patently illegal for it to have done so because that plan document was never negotiated with the unions. But the problem is that the MOUs themselves were only for a specified number of years. So it's difficult to say that the MOUs vested this right indefinitely when the MOUs were for finite periods of time. I understand, Your Honor, but this court in 2018 recognized that the MOU term, the two-year MOU term, should not control because that would suggest that the county took $150 million from the unions in 1992 and then committed to a one- or two-year program of benefits. This court said that was implausible in 2018. The terms of the MOUs that we look at under REAC-III include the implied terms and the expressed term. You're absolutely correct. There's no expressed term saying retirees get it forever. But MOUs under REAC-III and under CAL FIRE include implied and fact terms and implied and law terms. So the analysis is what was the character of the benefit? What was the negotiating history of the benefit? What was said at the bargaining table? What money did the benefit—from what money was the benefit funded? It does not stop at the language of the MOU. That was decided in REAC-III in 2011 and affirmed by this court in 2018. Does that answer your question, Your Honor? It answers my question. Counsel, I have a follow-up to one of Judge Rawlinson's questions. My reading of CAL FIRE was that if you had a benefit that qualified as deferred compensation, that you didn't actually need to prove intent. That meeting that definition of deferred compensation creates the vested right, and you don't have to separately prove intent. But it seems from your answer a few minutes ago that you think that intent is still required, even if you've proven that a benefit qualifies as deferred compensation. So can you clarify your position on that? You know, Your Honor, I guess in my mind it's a fine line. The way I read CAL FIRE is what they're saying is the nature of the benefit is the evidence of the intent. In other words, the words aren't magical. If the benefit looks like deferred compensation, sort of like a pension, then that is not evidence of intent. That's how I read it. Now, it could also be read that they're two entirely separate analyses. If it meets the definition, then you don't even ask about intent. I think that's a fair reading as well. I don't know if there's any material difference in this case between those two. Let's talk about a hypothetical, I guess, then for a minute. Let's say that the benefit created meets the definition of deferred compensation, but there's extrinsic evidence or other evidence to indicate that the public entity didn't intend to do that, did it by mistake maybe, I don't know. Then where are we left in terms of figuring out what to do with something that, as a matter of law, meets the definition of deferred compensation? Well, my personal opinion would be in that case that the mistake would fall on the employer and the employees would have a right to rely on the character of the benefit and treat it as vested in that case. I guess my answer is if it meets the definition of deferred compensation, then the quest for intent can stop. I actually think if you look for intent separate from deferred compensation, the way our case was in 2018 before CAL FIRE, it's still a very compelling case, that the intent is found in the bargaining history, the character of the benefit, the nature of the funding, et cetera. I just think CAL FIRE gives sort of a different lens on that analysis. Okay. I understand there is some confusion there. I saw it as well, Your Honor. I'm not entirely sure that I know the answer. Maybe the California Supreme Court will clarify that at some point. If I could very briefly move on to the ARBA theory that the district court dismissed without the county moving on it. There's no question the county didn't move on that theory. The county doesn't even try to defend the district court's reasoning for dismissing that. District courts can't dismiss theories of recovery without the opposing party moving on them, without giving an opportunity to respond. The district court didn't do that here. That's grounds for reversal in and of itself. We think that summary judgment was improper on the merits. This ARBA account was $384 million that was dedicated to retiree health benefits. The county says, remarkably, it doesn't know what happened to that money. That money was earmarked for retiree benefits. It was a bargain for a funding mechanism at the negotiating table. And the California Teachers Association v. Corey case says that a funding mechanism gives rights to implied contract rights if there's a palpable element of exchange. And here there's no question that the funding mechanism was set up in exchange for concessions at the bargaining table. I see that I have only a minute left, so I'll reserve that if I could. Unless there are more questions. Thank you, counsel. Thank you. Counsel for Appali? Mr. Hardinger? Oh, that happens from time to time. May it please the court, Arthur Hardinger representing the county of Orange. If you count the related REAC case, I've been with this case for over 13 years. And on behalf of the county, I urge the court to finally put this challenge to rest. I did want to pay a personal tribute to Jennifer Nock, who's been with me, who was with me for shoulder to shoulder on this case since the beginning. Poured her heart and soul into this case and died last year at the age of 53. But for, you know, her untimely passing, it would likely be her standing here, not me. And so I apologize. You've got me today. As I turn to the specific arguments advanced by the plaintiffs and to address Mr. Brown's and Mr. Brown's points and court's questions, I do want to emphasize that the county's program here and the reforms negotiated over 14 years were a significant success story. I mean, unlike in 1979, when the county was forced simply to cut off medical subsidies altogether here, the move made by the county in partnership with labor saved the plan. And we've got thousands of employees and retired thousands of retirees participating in quality group health coverage. And they're not disqualified by preexisting medical conditions. And I know the challenge here is now narrowly focused on the grant plan. And I'm going to turn to that shortly. But I just have to emphasize that the overall plan, and this is the third challenge to the retiree plan, plan issues and reforms in the county was included, expanding health plan choices for retirees and making a huge investment in outreach to help retirees understand their difficult plan options under the circumstances. I mean, remember one option on the table, as the CAO said in the record, eliminate the plan. And that did not happen. And the county is quite pleased that it was able to continue to the plan. CAL FIRE affirmed REOC 3, the California Supreme Court principles there, which the court, if the county did not intend this to be a vested benefit immutable and not properly subject to any sort of plan adjustment that falls on the county. I don't think you can take REOC 3 and CAL FIRE and possibly get there. CAL FIRE consistently throughout reaffirms REOC, the principles that courts proceed must proceed cautiously. There's a presumption against implication of vested rights. Extrinsic evidence must clearly and unmistakably show that the county gave up or an entity gave up its right to its presumptive rights to make changes. And CAL FIRE does not just throw that out the window and say, once you've got something that acts and looks like a potential deferred comp plan, then all of a sudden county intent doesn't matter and it falls on the county. That's exactly what the Supreme Court said. It was building in these safeguards to preclude these unforeseen windfalls, these unforeseen cases that would cause financial problems to the county. So I just don't think you can read it that way. And the other point that I that I need to make and was raised by the panel here is one of the driving forces in the last decision in Harris about why we're here is the argument advanced by the plaintiffs that the 1993 plan document simply was not shared, not negotiated, unknown kind of thing. And that's reflected in footnote five, where the decision says, you know, the simple existence of the anti-vesting clause, therefore, provides no basis for holding retirees implied contract claims implausible as a matter of law under an Iqbal analysis of what's plausibility. We're in a different place now, right? We have a developed record, fully developed, and it's undisputed that this legislative package, if you will, included the plan document, included the MOUs that incorporated some of the plan features of the plan document. It's been passed, sunshined, agendized in public, no question that this was a publicly and properly adopted piece of legislation. Council, excuse me. Sorry to go back, but I have to kind of come back to what Judge Wallinson asked originally. One of the things that we're hearing about today is whether or not summary judgment should have been granted in this case in favor of the county. You just said that everything that you're arguing is undisputed. It seems to me that there are a number of disputed facts in this case, and that that's what's being argued here right now is whether or not it's deferred comp, whether or not it's the best of right, what was the intent, what the issues are. Aren't those all genuine issues, a material fact that should have been flushed out through other methodology rather than just simply granting summary judgment on behalf of your clients? No, Your Honor, and here's why. I think that the question that was, is the issue here whether the county intended to confer a vested right and is there a tribal issue of material fact on that point? And I agree. Council said yes. I agree. That is the original point that was hammered home in REOC, hammered in CAL FIRE, and there is no disputed fact on that issue because you have an express resolution that says that there is no vested right, that the county does have the right to make adjustments. And that's exactly what the county did here. So there is no. So you have now this fragmentation of other evidence. And I do want to raise one other issue, which is part of the argument. Again, no disputed fact that the county's intent was not to create a vested right. That cannot be disputed because it's Hornbook law. You can't by implication contradict an express provision. And you have an express provision. Council, isn't the problem here that we have multiple documents and the MOUs, which were the negotiated documents, don't have the language that you're hanging your hat on here in this argument. That's in a separate document. So it's not as clear as you're trying to make it seem. Well, it is all clear that it was passed at one time. The enabling legislation is one package of legislation that has to be read together based on the authorities that we provided. That's the only way logically to read it. In other words. And I would also say there are the durational clauses in the MOU. You know, the prior Harris court did say no question that that in and of itself does not preclude necessarily a finding of vested rights, even though the presumption is that the benefits described in the MOU expire. That's why there is a durational clause. But it does create another hurdle for the plaintiffs to overcome in this case, which we don't think that they've overcome. And I do think that courts have recognized the Supreme Court in Tackett, Alejo Court, California Court, judges on this panel have recognized the importance of durational clauses and the presumption that they create about benefits in the MOU expiring and becoming subject to negotiation, renegotiation. So is it your position that the county could have, after the MOU express duration term expired, just said, we're not doing this grant program anymore, period. Just take it off the table. The answer to that is number one, the question is not presented here because that's not what happened. But number two, the answer ultimately is yes. If, for example, everything. I want to stop you there for a minute. So I think what we're struggling with, and it seems like what other courts have struggled with in the long history of this litigation is there are things that happen in the part of the negotiations of this grant program that just don't jive with that. That just don't seem consistent with that, including the amount of money, the funding mechanisms, the funding terms. So what are we supposed to do with that? I think you have to read it collectively and you have to start with the question that was raised and affirmed by my opponent. That is, is the issue here? Is there a tribal issue of fact on the county's intent to create an immutable vested right in a plan benefit that could never be changed? And the answer to that has to be because that's expressed has to be. There is no tribal issue there because you have an express instrument that says just to the contrary. And you've got these other funding arrangements. Let me let me let me address that. You've got, you know, the Arba arrangement, you know, similar arguments were made in the case about the other subsidy that was in place there and challenge. That is a methodology for how the benefit was calculated. And same arguments were made, similar arguments that look at the funding, look at the fact that the board looked at actuarial analyses that projected out 20, 30 years. And and that somehow demonstrated that there was a vested right in this area. And the court said, you know, these are these are fragments of evidence here. When you're talking about the pooling agreement, that's what you're talking about, right? The MOUs didn't make a promise for that, like they did with the grant. That's true, and the MOUs didn't make a promise here that you could never change any aspect of the benefit. In fact, they were all subject to expiration and renegotiation against the backdrop of an express anti-vesting provision. So all I'm saying is that, you know, this same kind of argument where the district court has struggled with that, where you've and you also have struggling with the fact that Cal Fire wasn't cited below. And the district court, if you read the reporter's transcript, is somewhat frustrated with kind of the different arguments that come up and the different directions that come up in the flow of this case. And so a lot of the evidence that, you know, the other kind of fragments of evidence about what people said, the bargaining history, those are ultimately, you know, ultimately can't overcome the first question. What was the county's intent, which Cal Fire affirmed? And if I can also talk about Cal Fire a little bit again, you know, this discussion in Cal Fire came up in the context of that is much different. And that is a traditional pension benefit where the law there has been, you know, in place. The court went back to 1917 and started with the O'Day case and went through the history of the California rule, which essentially is in place now. The court had no cause to change it, which basically freezes the benefit, if you will, and it vests at the time of employment. That's a different kind of a benefit plan that you that you don't have at issue here. And if you look at footnote 13, the Supreme Court specifically said it was not it was not it had never held that this analysis flows to other forms of employment benefits. So what you had was a discussion coming out of the context of the Pepper Amendment, which reformed this CalPERS airtime feature. And the court went through a recitation of of how it got to where it's gotten in that context. Here you're in a different area, and I say that because retiring medical plans are kind of intrinsically different than defined benefit plan, traditional defined benefit plans. There's myriad subsidies that run around in these plans, copays, plan design, geographical limitations. I mean, if you if you couldn't and those things get changed. So if you those don't get locked in. I mean, there's all in particular in the dynamic world of medical benefits. We're all aware of the cost and challenges associated with them. Those things are constantly changing. And it is what's implausible to me, given that the board adopted a plan that said that they had the right to make adjustments. Is that there's some suggestion that provisions in an MOU, along with ARBA, along with the 1% contribution, along with what other people said and did somehow lock the county into making any adjustments and preventing them from making any adjustments, which I just don't think you can get there. I don't think the court can get there, given the pronouncements in REAC and they're affirmed in CAL FIRE about county intent. There was no county intent to do this, and you can't find that. And to suggest that it just all falls on the county by mistake, hundreds of millions of dollars of exposure. Oh, it was just by mistake. This can't be right. That's what that REAC said. That's exactly why they built in the safeguards in REAC. Your time is almost up. I have one more question. I want to make sure I get in a procedural question. Is whether a benefit is deferred compensation or not, is that a question that would go to the jury or is that a question that a court needs to decide? That is a good question. I believe that's a legal question, but there's obviously presumably some factual components relative to that, if there were factual components. To me, again, this is off the cuff here because we're not there, and I certainly hope we don't go there. But I don't see how that would go to the jury without some very, very specific kinds of jury instructions that could potentially lead the jury there. And I also just wanted to say, I mean, in closing, I'm sorry, I'm over my time. The danger in these kinds of cases is kind of reflected here. And I've had a number of these cases where you've got now you've got 20, 30 decades old kind of recollections of people, what they thought things meant, mostly from folks who are potentially well-intentioned but self-serving, let's face it. And that's why courts look to what's in the record primarily. And if you look in the record in here, you just cannot overcome the county's expression of intent. Thank you. Rebuttal. Let me start where Mr. Hardinger left off. We're not basing our case on recollections or self-serving recollections. We have documented bargaining history. We have facts. There is recollection from all three of the people who were in charge of this process, and that counts for a lot. There's no rule that says that recollection of recipient witnesses doesn't count in a vested rights case. Mr. Hardinger talks about myriad subsidies in these plans. This is not a myriad subsidy. It is a benefit that was bargained for, paid dearly for by the unions, and it had a specific funding mechanism that was dedicated. It's not one of these, like, can you switch from Cigna to Kaiser? It's a different kind of thing. This is a benefit that was specifically bargained. This is not like the REopt case. The REopt case did not involve a collectively bargained benefit. It was not proportional to time served. It was not in the MOUs. It's a much different case. The plan document cannot be read the way Mr. Hardinger wants to read it. Passing legislation in public session is not a substitute for complying with the MMBA. That would gut the MMBA. If a county could simply go and pass legislation that took away rights that conferred in the MOUs, there would be no point to collective bargaining. It would be a charade. There are disputed issues of fact. There is certainly a disputed issue of fact about whether the plan document was ever mentioned during collective bargaining. This is a case for the jury. The summary judgment does not get granted when there is a dispute of fact as to the party's intent, even if the standard is higher than a normal intent standard. The idea that they could have taken this away after one year, it remains implausible, as implausible as it was in 2018 when this court said it was implausible. That is ridiculous to say. But counsel, you do agree that we're at a different standard now. That was the pleading standard at that point. I completely understand, Your Honor. And we have evidence to prove everything that we pled. In fact, the record was fairly well developed by the time of the 12C motion, as a matter of fact. I do understand. I am not saying that because of Harris, we win. I am saying that the rationale doesn't disappear on remand. And the idea that you could go one year and cancel it, that was the intent, is ridiculous. There is a better way to read the plan document. The plan document says the county retains whatever power it didn't give away at the bargaining table. If you read Section 5.4 and 5.5 together with 1.3, that is the best way, reasonable and lawful way to read it. The county was saying, outside of the MOUs, we're not creating any rights to anything. Our power is total, except as set forth in the MOUs. But the difficulty with that argument is that the MOUs only grant the benefit for a finite period of time. Well, that's the question that's presented, Your Honor. They don't say how long. Well, but they each have a termination date. Correct. But we know from prior cases that that is not determinative. It might be evidence. What case says that's not determinative? Well, if it was determinative, Your Honor, we wouldn't have won in 2018 because there was no dispute about the duration. Well, but the issue was whether or not, at that point, the issue was whether or not a plausible claim had been alleged. Correct. And so, giving the benefit of every doubt to interpretation of the complaint, the determination was that it was not completely implausible. So that doesn't, to me, that doesn't answer the question as to how you can say it's indefinite if the MOUs have a finite termination date. That's where all the evidence of bargaining history and how it was paid for at the bargaining table, how it was presented. Employees paid their own money into a program, and the county is saying they could just take it away whenever they wanted. It was their own money. None of that's challenged. Are those issues of fact that all of that history is unchallenged? And then the issue becomes whether or not the plan documents have an implied vested right. Correct. The plan document, I'm saying, cannot be read the way that I understand at first glance, it looks like, oh, there's no vesting here. But if you read it together with 5.4 or 5.5 in the MMBA, it cannot mean what the county says it means. But isn't that an issue of law if everybody agrees what the history was, everybody agrees what the plan documents are? How is there a material issue of fact? Well, on that question, I think there's not. The court just got it wrong. That is a legal question. There's no dispute. There may be a dispute about whether it was presented to the unions, maybe. I don't think we proved that pretty well. But I do think that particular question of whether you can read a county legislation as clearly in violation of the MMBA, that is a legal question. And courts do not read contractual documents to be illegal. And they don't describe illegal intent to counties. It was void, it was beyond the county's jurisdiction if that was its intent.  I think its intent was to say the MOUs is where the rights begin and end. And, therefore, the plan document just begs the question, what do the MOUs say? And MOUs include implied as well as expressed terms. That has been established for 10 years. But what's your response to opposing counsel's position that if there is an expressed term, there can be no implied term? But that assumes that the expressed term says we don't, nothing vests. I'm saying the expressed term, our reading of the expressed term is the better reading, much better reading. It says these things vest under the MOUs. Go look at the MOU analysis. Other than the MOUs, we're not, just like creating this plan, we're not giving anyone any rights. Look to the MOUs. And that's in the expressed language of the plan. 5.4 says that. It doesn't give the county total power. It gives it power except as set forth in the MOUs. And that includes implied terms. Are there any other questions from the panel? No. All right. Thank you, counsel, for your helpful arguments. The case is submitted for decision by the court. The next two cases. Thank you. Thank you.
judges: Rawlinson, England, Hunsaker